# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-13-00802-CV

Byron David Pearson, Appellant

v.

Heather Pearson, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-FM-11-003060, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from a divorce decree. Byron David Pearson (known as Snap Pearson) and Heather Hudson Pearson were married in 2000 and filed for divorce in 2011. Two children were born during the marriage. The parties submitted three disputed issues to the trial court: the characterization and value of a business interest, rules governing their children's air travel, and the enforceability of their post-nuptial agreement. The trial court characterized the business interest as community property and issued orders concerning the children's private air travel. Mr. Pearson appeals those rulings.[1] The trial court also found that the marital property agreement was unenforceable, but he does not challenge that decision. The parties did not request findings of fact or conclusions of law, and none were filed. To decide Mr. Pearson's complaints, we

---

[1] Witnesses gave pretrial deposition testimony. The case originally commenced before a jury and testimony began, but a mistrial was declared before the cause concluded. The parties then agreed to a trial before the court. Witnesses were examined and cross-examined with respect to their testimony at each stage.

must do a thorough search of the lengthy record to determine whether the evidence supports the trial court's rulings. We will affirm.

During marriage, Mr. Pearson acquired an interest in a business owned by Mrs. Pearson's family, which he claimed as his separate property. Mrs. Pearson asserted that it was community property. They dispute who had the burden of proof on characterization and whether that burden was met. The trial court found the business interest to be community property, awarded it to Mr. Pearson, and awarded Mrs. Pearson offsetting property under a 52%-48% split in her favor.

Mr. Pearson contends that, because the business interest was transferred to him from his mother-in-law and his wife, it was presumed to be a gift to him. He further contends that, once he raised the presumption of gift, the burden shifted to Mrs. Pearson to disprove their intent to make him a gift. In his third issue, he argues that the trial court erred by placing the burden on him to prove the donors intended to make him a gift. In his fourth issue, he argues that the evidence is legally and factually insufficient to prove by clear-and-convincing evidence that the transfer of the business interest to him was not a gift.

**BACKGROUND**

Joe McQueen, Mrs. Pearson's maternal grandfather, started a manufacturing business in the 1950s called IEC Corporation. It designs and assembles slip rings, an electromechanical connecting device that allows transmission of power and electrical signals from a stationary to a rotating structure. The business was incorporated and issued 100 shares of stock.

Mr. McQueen died before the Pearsons married, and his forty-seven shares of stock were held by the J.B. McQueen Marital Trust. Mrs. Pearson's grandmother Beatrice McQueen

2

owned five shares, Mrs. Pearson's mother Diana Hudson and her father John Paul Hudson each owned twenty-one shares, and Mrs. Pearson and her brother Casey Hudson each owned three shares. All the family, including Mrs. Pearson, had worked in the business over the years.

As attorney Bill Leighton testified, many small family-owned businesses handle their business affairs and record-keeping informally, without following proper formalities in carrying out their business activities. IEC was no exception. Mrs. McQueen, for example, still drew a substantial salary, although she no longer worked in the business. The Hudsons explained that she owned the company. The stock log was handwritten and not always up to date.

Mr. Hudson was managing the company, but by late 2003 and 2004 it was struggling and in debt. IEC was unable to pay federal payroll taxes, and the Hudsons had to guarantee a personal line of credit to make payroll and cover expenses.

Mr. Pearson was a computer programmer with a background in designing custom programs. He was working for Casa Mechanical Services, a plumbing and air conditioning contractor, earning $250,000 per year. He designed a computer program that the company used and marketed to other companies and would receive 50% of the proceeds from the sale of the program so long as he worked for Casa. Before the marriage, he wrote an automation program for IEC and updated and networked the company's computer systems, so he had some familiarity with the business.

Mr. Pearson testified that Mrs. Pearson was worried about her parents and began to encourage him to go to work at IEC to help them. In deciding whether to do so, Mr. Pearson's testimony reflects that he was primarily concerned with protecting his own self-interest. Even before discussing the possibility with the Hudsons, he personally researched Texas property laws and

3

educated himself on the definitions of separate property and community property. He obtained a legal understanding of the meaning and significance of separate property, including the concept that property acquired during marriage by gift is separate property. He wanted to ensure that any business interest he acquired would be his separate property, not community property. He understood that generally the income from separate property is community property, and he researched how to change the income into his separate property so that it would not be community property with Mrs. Pearson. He discussed the issues with what he described as "lots of lawyer friends" and "lots of friends who had divorced." He did not recall whether he related any of this information to anyone. Mrs. Pearson and her parents did not indicate an understanding of these concepts at the time.

Mr. Pearson testified that he told Mrs. Pearson that he would only go to work at IEC if 50% of the stock was his separate property and the income therefrom was his separate property. He understood the meaning of separate property and wanted to protect himself from being "kicked out" in case of family turmoil or divorce. He does not know whether he explained his research findings or the significance of separate and community property to Mrs. Pearson or to the Hudsons. He does not know whether he ever explained to the Hudsons that if they gave stock to him, Mrs. Pearson would own no financial interest in IEC. He stated that he and Mrs. Pearson discussed his terms and agreed in advance that all would be his separate property. Mrs. Pearson wanted him to feel secure about his place in the family business, but she denied this agreement.

Mr. Pearson testified that he met with Mr. and Mrs. Hudson in June 2004 and agreed to go to work at IEC on the conditions that (1) the Hudsons give him fifty shares of stock as his separate property and (2) he would have full authority to make changes he thought necessary to turn the business around. The Hudsons did not yet own fifty shares but agreed to transfer stock to

4

him sometime in the future after Mrs. McQueen died and Mrs. Hudson inherited. The Hudsons and Mr. Pearson wrote their agreement on a legal pad and signed it. Mr. Pearson made a copy and put it in his file drawer at home. He testified that the agreement stated that the Hudsons would gift him fifty shares of stock.

The Hudsons testified that they signed an agreement with Mr. Pearson that he would have control of the business and that they would transfer fifty shares of stock to him if he came to work at IEC and was able to turn the business around. Mr. Hudson testified that they agreed to pay him with their stock to do this service for them. There was no reason they would give the stock to Mr. Pearson and cut out their daughter from her grandfather's business. Mrs. Hudson testified that there was never any discussion with Mr. Pearson about a gift, and they never discussed with him that the shares would be his separate property. She testified that there was no discussion of gift or separate property at the time of the agreement or when she "wrote his shares out" when they were transferred to him at the end of 2005. She testified that they never had any intention to make him a gift; their intention was that the Hudsons would own half the business and the Pearsons would own half. They had never seen it as a gift—"Never." Mrs. Hudson insisted, "It was never a gift." "We never saw it as a gift." "We still don't see it as a gift." The Hudsons considered the transfer compensation for Mr. Pearson, without considering that compensation would ordinarily come from the company rather than other shareholders or partners. Their intention was to provide him an interest in their business and compensate Mr. Pearson with part of their stock if he could make the business profitable again. It was unclear what would happen if he did not improve the business.

Mr. Pearson went to work for IEC in 2004 at a salary of $75,000. Mrs. Pearson testified that her parents were excited to go into business with Mr. Pearson so he could help them

5

"pull out of this." The business became profitable; at the end of 2005 the Hudsons received an unprecedented bonus.

Mrs. McQueen died February 24, 2005. Her shares and the trust shares passed to the heirs, subject to probate administration. Mrs. McQueen's will left all the IEC stock to Mrs. Hudson, but she was to pay her sister a sum to equalize their inheritance. The Hudsons paid the sister in March 2006.

After Mr. Pearson was in control, IEC retained attorney Bill Leighton, Mr. Pearson's friend[2] and golf acquaintance, to convert the company from a Sub-S corporation to a limited partnership for tax reasons. The new business was named IEC Company, Ltd. Another entity, IEC Management Company, LLC, was created to be the 1% general partner, with Mr. Hudson as the owner.

The conversion and partnership documents, prepared by Leighton, were signed February 7, 2006, with an effective date of conversion September 30, 2005. The Hudsons signed the documents. Although no interest in the business had been transferred to him, the documents stated that Mr. Pearson was a 50% limited partner; Mrs. Hudson's share was 26%, Mr. Hudson's share 20%, and Casey's share 3%. Mrs. Pearson was not listed as a partner, nor did she sign the agreement.

Although the company was now a limited partnership and not a corporation, the parties continued to deal in and reflect their ownership in shares of stock. By the end of 2005, Mrs. Hudson received her inheritance, and Mr. Pearson wanted her to transfer the stock shares

---

[2] Mr. Pearson met Leighton at the country club; they played golf together and discussed their business affairs. The Hudsons and the Leightons later became social friends.

6

to him to finalize their agreement. Mrs. Hudson owned seventy-three shares, Mr. Hudson owned twenty-one shares, and Mrs. Pearson and Casey each owned three shares. Mrs. Hudson testified that on December 29, 2005, she prepared two stock certificates transferring twenty-five shares to Mr. Pearson and twenty-two shares to Mrs. Pearson, so that together they would have fifty percent ownership, and left the certificates on Mr. Pearson's desk. He denied finding them and questions her various versions of events. In earlier testimony, she said that she wrote the two certificates in the stock log book, but they were never entered into the log. At trial, she testified that she may have destroyed the two certificates without listing them.

Mrs. Hudson testified that while the Hudsons were in Burnet at a real estate closing that day or the next, Mr. Pearson called them "furious" over the two certificates that included Mrs. Pearson. According to the Hudsons, he demanded that they put all the shares in his name alone.

On December 31, 2005, Mr. Pearson and the Hudsons met at the IEC office, and the Hudsons gave Mr. Pearson a certificate for forty-seven shares of IEC corporate stock in his name. These were the shares Mrs. Hudson inherited that had been owned by the McQueen trust. At some point Mrs. Hudson contacted Mrs. Pearson about her three shares, and Mrs. Pearson apparently authorized her mother to do whatever Mr. Pearson wanted. Mrs. Hudson cancelled Mrs. Pearson's certificate and made out a second certificate in Mr. Pearson's name for three shares.

The result was that Mr. Pearson had two certificates in his name totaling fifty shares, Mrs. Hudson owned twenty-six shares, Mr. Hudson owned twenty-one shares, and Casey owned three shares. Mrs. Pearson had none. The stock book in Mrs. Hudson's handwriting shows that "as of 12-31-05" Mr. Pearson owned fifty shares. Mr. Pearson testified that his two stock certificates

7

and the handwritten agreement with the Hudsons were missing from the house, and were never located or produced.

Mrs. Hudson testified that at tax time in 2006, Mr. Pearson told the Hudsons that they needed to file a gift tax return for the stock transferred to him. According to her, Mr. Pearson said that he and Mrs. Pearson did not want to pay income taxes on the transfer of stock, and that the Hudsons would not be hurt by filing a gift tax return, because they could pay now or their estate would pay later. We note that Mr. Pearson would only owe income tax if the stock were compensation.

At some point Mr. Hudson made some notes, one saying "cost of giving stock to Mr. Pearson" and another stating "47% stock to Mr. Pearson as compensation." Mr. Pearson encouraged Mr. Hudson to confer by phone with Leighton and on a "sticky note" wrote the issue for him to discuss with Leighton: "How can you treat compensation different than a gift and backdate compensation and not backdate gift." Mr. Pearson could not explain what he meant by this inquiry.

Both Mr. and Mrs. Hudson stated that they had attorney Leighton file federal gift tax returns at Mr. Pearson's direction to keep Mr. and Mrs. Pearson from having to pay income taxes. Mr. Pearson denied having anything to do with the gift tax returns, but Mrs. Hudson said that everything went through Mr. Pearson. Leighton's discussions about the returns were mostly with Mr. Hudson, even though Mrs. Hudson made the transfer. Leighton reviewed Mrs. McQueen's estate information and apparently, he determined the date to use for the gift. Mr. Pearson testified that everything was backdated to the day after Mrs. McQueen died, and the date of the gift was stated to be February 25, 2005. The federal gift tax returns, dated October 16, 2006, split the gift between the Hudsons and reflect that each gave Mr. Pearson 23.5 shares worth $127,431, a total of almost

$255,000, which utilized a portion of the Hudsons' unified exemption equivalent amount and therefore reduced the amount remaining available to them. Mr. Hudson testified that he did not actually know what a gift tax was; he thought it was "us paying the tax instead of them." If someone had told him that signing the form made the property Mr. Pearson's, he would not have signed it. The company's 2005 income tax return, prepared after Mr. Pearson was managing the business, also shows that Mr. Pearson owned fifty shares as of February 25, 2005, the day after Mrs. McQueen's death. Mrs. Pearson argues that the Hudsons only owned or controlled twenty-one shares apiece as of that date and could not have given Mr. Pearson fifty shares by then.

By 2006, a rift had formed in the working relationship between Mr. Hudson and Mr. Pearson. Opinions on the reasons differed. Mrs. Hudson stated that Mr. Pearson's management style was bullying, yelling, and raising his voice very loudly. A partner who later bought into the business also alluded to Mr. Pearson's manner of dealing with issues.

Mr. Pearson encouraged two investors to approach the Hudsons about buying their remaining interest. In mid-2006, the Hudsons sold forty shares to the investors and gave their remaining seven shares to their son. At that point, Mr. Pearson owned 50% of the company, the two new investors each owned 20%, and Casey owned 10%. An amended partnership agreement was prepared in April 2006, effective January 1, 2006, but the record reflects that it was not signed until March 2012. It reflects Mr. Pearson as owner of the general partner, even though there was never a formal transfer of this 1% interest from Mr. Hudson to Mr. Pearson.

After her parents relinquished their interest, Mrs. Pearson sent an e-mail to Mr. Pearson containing a draft message she was considering sending to her parents. In it, she complained that they gave Casey their remaining shares but none to her. In the draft, Mrs. Pearson

9

wrote, "We all know that Mr. Pearson's 50 percent was legally considered a gift, and therefore, I have no community right to any of it." She never sent the e-mail to her parents, but Mr. Pearson forwarded her draft to Leighton with the comment, "Finally, a smoking gun from Heather. This should seal her fate."

In early 2007, Mr. and Mrs. Pearson met with Leighton for estate planning. His questionnaire lists the IEC stock as Mr. Pearson's separate property. Leighton says his information came from both parties. Mrs. Pearson denied attending the meeting, but notes in her handwriting state that, in event of divorce, she would get no IEC stock but Mr. Pearson would pay her for her three shares.

Among other documents, Leighton prepared a marital property agreement. It states that the IEC stock is Mr. Pearson's separate property and that the income from the stock would also be his separate property. It also provides that, in the event of divorce, Mr. Pearson would pay Mrs. Pearson for her three shares of stock. Mrs. Pearson did not have independent legal counsel for these transactions, and she alleged that she did not voluntarily sign the agreement. The parties executed the document, but the trial court found the agreement unenforceable.

## LEGAL PRINCIPLES AND STANDARDS OF REVIEW

### No findings of fact or conclusions of law

Where findings of fact and conclusions of law are not requested or filed, the judgment of the trial court implies all fact findings necessary to support the judgment, and the judgment must be affirmed if it can be upheld on any legal theory supported by the record evidence. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766-67 (Tex. 2011); *In re W.E.R.*, 669 S.W.2d 716, 717 (Tex. 1984);

10

*Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *see* Tex. R. Civ. P. 296. Implied findings may be challenged in the same manner as a trial court's written findings or a jury verdict. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989). The appellate court cannot look to comments the judge makes from the bench as a substitute for findings of fact and conclusions of law. *W.E.R.*, 669 S.W.2d at 716; *see* Tex. R. Civ. P. 296. In any event, a written judgment controls over the trial court's oral pronouncement. *In re K.M.B.*, 148 S.W.3d 618, 622 (Tex. App.—Houston [14th Dist.] 2004, no pet.). The trial court is free to state its oral ruling and then modify its decision in its written judgment, and no additional evidence is required for it to do so. *Cook v. Cook*, 888 S.W.2d 130, 131-32 (Tex. App.—Corpus Christi 1994, no writ); *see Cash v. Cash*, No. 03-04-00560-CV, 2005 Tex. App. LEXIS 5909, at *10-11 (Tex. App.—Austin July 27, 2005, no pet.) (mem. op.).

### *Separate and community property; division of property*

The Texas Family Code directs the trial court to order a division of the marital estate in a manner that the court deems just and right. Tex. Fam. Code § 7.001. The court cannot divest a party of separate personal property, *Cameron v. Cameron*, 641 S.W.2d 210, 219-20 (Tex. 1982), or separate real property, *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 142 (Tex. 1977). Otherwise, the trial court has broad discretion in determining the division. The appellate court reviews the division for an abuse of discretion. *McKnight v. McKnight*, 543 S.W.2d 863, 866 (Tex. 1976). The ruling will not be disturbed on appeal absent abuse. *Cockerham v. Cockerham*, 527 S.W.2d 162, 173 (Tex. 1975). A trial court abuses its discretion only when it acts in an unreasonable or arbitrary manner, or when it acts without reference to any guiding rules or principles. *Worford v. Stamper*,

11

801 S.W.2d 108, 109 (Tex. 1990); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

Property owned or possessed by either spouse during or on dissolution of marriage is presumed to be community property. Tex. Fam. Code § 3.003. Community property includes any property, other than separate property, acquired by either spouse during marriage. *Id*. § 3.002. This is true without regard to whether the property or ownership interest is held in the name of only one spouse or in the names of both. As a general rule, property conveyed to one spouse during marriage is presumed to be community property, unless it is "displaced by a different or contrary presumption that would show that the property so conveyed was in fact separate property." *Kyles v. Kyles*, 832 S.W.2d 194, 196 (Tex. App.—Beaumont 1992, no writ).

The community property presumption can be overcome by evidence that the property was acquired by gift. *Id*. at 197. A gift is a voluntary transfer of property to another made gratuitously and without consideration. *Magness v. Magness*, 241 S.W.3d 910, 912 (Tex. App.—Dallas 2007, pet. denied). Property a spouse acquires by gift during marriage is the separate property of the recipient spouse. Tex. Fam. Code § 3.001(2). To show that a transfer of property was a gift, the recipient must establish: (1) the donor's intent to make a gift; (2) delivery of the property; and (3) acceptance of the property. *In re Marriage of Moncey*, 404 S.W.3d 701, 710 (Tex. App.—Texarkana 2013, no pet.).

The recipient of property has the burden to prove the gift, and therefore the separate character of the property, by clear-and-convincing evidence. *Id*. at 705-06, 710; *see* Tex. Fam. Code § 3.003(b). The burden of proof in refuting a presumption of gift is also by clear-and-convincing

12

evidence. *Bogart v. Somer*, 762 S.W.2d 577, 577 (Tex. 1988); *Amador v. Berrospe*, 961 S.W.2d 205, 207-08 (Tex. App.—Houston [1st Dist.] 1996, pet. denied).

### *Clear-and-convincing evidence*

Clear-and-convincing evidence is defined as that degree of proof that produces in the mind of the trier of fact a firm belief or conviction about the truth of the allegations sought to be proven and established. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *see* Tex. Fam. Code § 101.007.

### *Transfers within family*

Interspousal transfers are presumed to be a gift and, thus, the separate property of the recipient spouse. *In re Marriage of Morrison*, 913 S.W.2d 689, 692 (Tex. App.—Texarkana 1995, writ denied). A presumption of gift may also arise with respect to transfers between family members, such as a parent and child, on the basis that the recipient is the natural object of the donor's or grantor's bounty and affection. *Kyles*, 832 S.W.2d at 197; *Somer v. Bogart*, 749 S.W.2d 202, 204 (Tex. App.—Dallas 1988, writ denied). For example, when a parent pays the purchase price for real property and puts the title in a child's name, or vice versa, a presumption of gift arises. *Equitable Trust Co. v. Roland*, 721 S.W.2d 530, 533 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.); *Murphy v. Metropolitan Life Ins. Co.*, 498 S.W.2d 278, 282 (Tex. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.). These relationships may include in-laws. *Amador*, 961 S.W.2d at 207 (father-in-law natural object of son-in-law's bounty and affection); *Somer*, 749 S.W.2d at 204 (son-in-law natural object of father-in-law's bounty and affection). All these presumptions are rebuttable.

13

*Legal and factual sufficiency review*

In conducting a legal sufficiency review, we view the evidence in the light most favorable to the trial court's findings, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We view the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support the finding. *Id.* at 822. The ultimate test for legal sufficiency is whether the evidence at trial could enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. When the burden of proof at trial was clear-and-convincing evidence, the appellate court looks at all the evidence in the light most favorable to the finding to determine whether the evidence was sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegation. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

When reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence in the record and set aside the finding only if the overwhelming weight of the evidence supporting the finding is so weak or the finding so against the great weight of the evidence as to be clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When the burden of proof at trial was clear-and-convincing evidence, the appellate court must determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the fact to be proven, giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

In considering the evidence, we are mindful that the trier of fact is the judge of the credibility of the witnesses and the weight to give their testimony. "[T]he trial judge is best able to observe and assess the demeanor and credibility of the witnesses and to sense the 'forces, powers, and influences' that may not be apparent from merely reading the record on appeal." *In re A.L.E.*, 279 S.W.3d 424, 427 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

## DISCUSSION

Our analysis is complicated by the conflicting dates asserted to be the date of gift or transfer of the business interest to Mr. Pearson. It is further confused by the fact that the parties argue over and rely upon the transfer of corporate stock after the business had been converted to a limited partnership, in which ownership would be expressed as sharing ratios rather than shares of stock.

The evidence shows that Mr. Pearson, Mrs. Hudson, and Mr. Hudson met together in 2004 and agreed that, if Mr. Pearson would join the business and "turn it around," the Hudsons would transfer to him a 50% ownership interest in the business after Mrs. Hudson inherited at some unknown time in the future. It happened that Mrs. McQueen died within the year, but the transfer could not occur until after her death because the Hudsons did not own enough shares. Whether they intended this future transaction to involve a gift to Mr. Pearson in the legal sense is disputed. Apparently, the Hudsons believed that they could personally compensate Mr. Pearson with their own stock for reviving their business.

It is undisputed that, at the time of divorce, the business interest in issue—whether a limited partnership or shares of stock—was held in the name of David Pearson. Nevertheless,

15

initially the business interest was presumed to be community property because it was an asset acquired during marriage and owned by one of the spouses on dissolution of marriage. Mr. Pearson had the burden to refute this presumption. He says that he did so by showing the source of his ownership, supported by documentary evidence in the record.

It is also undisputed that no shares of stock were transferred to Mr. Pearson before the conversion. No formal transfer of stock from Mrs. Hudson and Mrs. Pearson to Mr. Pearson occurred until December 31, 2005. Nevertheless, the gift tax returns and the business tax return, all prepared in 2006, show that Mr. Pearson somehow acquired shares in the corporation February 25, 2005, the day after Mrs. McQueen died. The partnership agreement, signed by Mr. and Mrs. Hudson, shows that Mr. Pearson acquired a 50% limited partnership interest effective September 30, 2005.

Mr. Pearson first relies upon his contention that he and the Hudsons had an agreement in 2004 that the Hudsons would gift him fifty shares of stock in IEC after Mrs. McQueen died. As Mr. Pearson concedes, however, a gift cannot be made to take effect in the future; a promise to give is without consideration. *See Fleck v. Baldwin*, 172 S.W.2d 975, 978 (Tex. 1943).

Mr. Pearson further argues that, in any event, the prior promise was of no consequence, because Mrs. Pearson and Mrs. Hudson actually transferred stock to him on December 31, 2005, a completed gift. Because the transfers came from his mother-in-law and his wife, the transactions raised the presumption that the transfers were gifts to him as the natural object of each woman's bounty and affection. Mr. Pearson contends that once he raised the presumption of gift, Mrs. Pearson had the burden to disprove their donative intent, which she failed to do.

16

Assuming without deciding that Mr. Pearson is correct in placing the burden, the trial court's decree implies the necessary findings in support of the judgment. That is, assuming Mr. Pearson raised the presumption of gift, which thereby required Mrs. Pearson to disprove the donors' intent to make a gift, the record contains evidence to support that finding. The question then becomes whether the evidence is clear and convincing.

Mr. Pearson directs us to documentary evidence in the record that supports his position. He points out that the partnership interest and stock certificates were placed only in his name. Mr. and Mrs. Hudson had agreed that Mr. Pearson would have decision-making control of the business. Putting the partnership interest in Mr. Pearson's name is consistent with allowing him to manage the business and would entitle him to sole management and control of the business interest. *See* Tex. Fam. Code § 3.102. But that does not necessarily prove the character of the interest. Mr. Pearson relies especially upon the gift tax returns filed by the Hudsons, which he argues prove that the transfer from Mrs. Hudson was a gift to him. Standing alone, this evidence is significant and persuasive. However, the returns state a date of gift inconsistent with other evidence, and Mr. and Mrs. Hudson both testified to circumstances and reasons explaining the filing of these returns and disputing gift.

Mr. Pearson attacks Mrs. Hudson as an untruthful witness and contends her testimony is highly suspect, unworthy of belief, incredible, and created after-the-fact. As stated in his reply brief: "All of the observable documentary evidence reflects a gift to [Mr. Pearson]. The only contrary evidence is the incredible testimony of Diana Hudson, a demonstrably untruthful witness." The appellate court does not determine credibility of a witness; the fact finder is the judge of the credibility of a witness and the weight to give her testimony.

17

Mr. Pearson also argues that the donors' contrary position only arose with the divorce proceeding. According to Mr. Pearson, everyone treated the transfer of stock as a gift to him until the divorce proceeding. Mr. Pearson's comment to Leighton at the end of 2006 that Mrs. Pearson's e-mail at last recognizes his ownership and "[f]inally . . . seals her fate" suggests that Mrs. Pearson had previously disputed or not recognized his separate-property ownership.

Mr. Pearson also focuses upon the trial court's oral statements from the bench that the transfer was either a gift to both Mr. and Mrs. Pearson[3] or a bargain for a transfer for which Mr. Pearson received consideration, thus showing that the court applied an incorrect legal rule to reach its decision. As Mr. Pearson's reply brief states, "That the Hudsons were allegedly sloppy in their observances of corporate formalities" does not make the court's theory valid. Again, on appeal we determine whether evidence can support the court's ruling in the decree, applying the correct review, regardless of statements from the bench. In any event, the testimony of all concerned shows that the transfer was dependent upon Mr. Pearson going to work at IEC, improving its performance and management, and increasing its profits. He went to work for a substantial decrease in salary on the basis that he would work to improve the fortunes of the company in exchange for receiving an ownership interest, which at least suggests consideration and not a gratuitous gift.

The testimony of Mrs. Pearson and Mr. and Mrs. Hudson, if believed, supports that they lacked donative intent to make a gift of the business to Mr. Pearson. Mrs. Pearson did not sign the partnership documents and did not herself make the stock transfer to Mr. Pearson, even though

---

[3] A gift cannot be made to the community. *In re Marriage of Moncey*, 404 S.W.3d 701, 710 (Tex. App.—Texarkana 2013, no pet.).

18

she authorized it. Further, some evidence shows that Mr. Pearson agreed to pay Mrs. Pearson for her three shares of stock in the event of divorce, casting doubt on its character as a gift.

Mr. Hudson and Mrs. Hudson signed documents recognizing Mr. Pearson's partnership interest even before they transferred stock to him. Nothing in writing at the time of the December 2005 transfer of stock reflects that the transfers were gifts. By that time, a corporation no longer existed, and Mr. Pearson already had a 50% interest in the limited partnership. The Hudsons explained their reasons for filing gift tax returns at Mr. Pearson's direction. The tax returns reflect that the business interest was transferred to Mr. Pearson the day after Mrs. McQueen died, although no partnership documents had yet been signed and no stock had yet been transferred. Attorney Leighton suggested that this might reflect another example of the informal nature of transactions between family members in a family business. However, a gift requires delivery, and it is undisputed that no formal transfer of stock occurred for ten months, although the partnership agreement reflected his interest. While a partnership agreement may be executed on one date, with a retroactive effective date, Mr. Pearson cites us to no case in which a gift can be made retroactive to an earlier date.

Although we generally agree with the sentiment expressed in *In re McMahen*, No. 07-13-00172-CV, 2014 Tex. App. LEXIS 6154 (Tex. App.—Amarillo, June 6, 2014, no pet.) (mem. op.), we find it distinguishable. In *McMahen*, the question of gift was undisputed; the dispute regarded the recipient of the gift. *Id*. at *1-2. The parents gave three checks to three individuals, including their daughter and her husband, each marked "a gift"; each was in amount within the annual exclusion, which would avoid gift tax. *Id*. If combined, tax would be owing. Gift tax returns were filed showing no tax due. *See id*. at *7. When divorce ensued, the parents tried to show that

19

they intended all the money for their daughter, but the appellate court did not accept the argument. *Id*. at *8. Here, the question of gift is disputed; there was no attempt to avoid gift taxes.

Mr. Pearson initially had the burden to prove that the business transfer to him was a gift—that is, that the transferors made a voluntary transfer to him, that it was made without consideration, and that the donors intended it to be a gift. Assuming that Mr. Pearson raised the presumption of gift by showing the transfer from his wife and mother-in-law, our review of the evidence reflects that the trial court could find from clear-and-convincing evidence that Mrs. Pearson and her parents did not intend to make a separate-property gift of the business to Mr. Pearson.

**Possession order concerning children's air travel**

The Pearsons are the parents of two daughters. Sydney was born in 2004, and Peyton was born in 2009. At the time of the final hearing, they were ages eight and two respectively.

Mr. Pearson is a licensed pilot who has flown for a number of years and has an instrument rating. He owns a propeller-driven, non-pressurized, single-engine, private aircraft that he flies himself. He complains about the conditions set on the children's air travel. In his first issue, he questions whether the record contains legally and factually sufficient evidence of good cause to restrict his air travel with his children. In his second issue, he asks whether the trial court's order regarding the children's air travel violates the Texas Family Code and constitutes an abuse of discretion.

***Standard and scope of review with respect to terms of possession***

The best interest of the child shall always be the court's primary consideration in determining issues such as conservatorship and terms of possession and access to the child.

20

Tex. Fam. Code § 153.002; *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). The trial court has wide latitude in determining best interest. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). We review a trial court's decisions on child custody, control, possession, and visitation for abuse of discretion. *In re J.R.D.*, 169 S.W.3d 740, 742-43 (Tex. App.—Austin 2005, pet. denied). The court's ruling will be reversed only when it appears from the record as a whole that the trial court has abused its discretion. *Gillespie*, 644 S.W.2d at 451. We will not reverse unless the trial court acts unreasonably, arbitrarily, or without reference to any guiding rules and principles. *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.) (citing *Downer*, 701 S.W.2d at 241-42 and *In re Marriage of Jeffries*, 144 S.W.3d 636, 638 (Tex. App.—Texarkana 2004, no pet.)); *Coleman v. Coleman*, 109 S.W.3d 108, 110 (Tex. App.—Austin 2003, no pet).

Under an abuse-of-discretion standard, legal and factual sufficiency of the evidence are not independent grounds of error but rather are relevant factors in assessing whether the trial court abused its discretion. *Coburn*, 433 S.W.3d at 823; *Flowers v. Flowers*, 407 S.W.3d 452, 457 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied); *Ditraglia v. Romano*, 33 S.W.3d 886, 889 (Tex. App.—Austin 2000, no pet.); *Doyle v. Doyle*, 955 S.W.2d 478, 479 (Tex. App.—Austin 1997, no pet.). In making this determination, we consider whether the trial court had sufficient evidence upon which to exercise its discretion and, if so, whether it erred in the exercise of that discretion. *Coburn*, 433 S.W.3d at 823; *Zeifman*, 212 S.W.3d at 588; *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied); *Jenkins v. Jenkins*, 16 S.W.3d 473, 478 (Tex. App.—El Paso 2000, no pet.). We will uphold its judgment on any legal theory supported by the evidence. *Worford*, 801 S.W.2d at 109.

21

The appellate court may not substitute its judgment for that of the trial court, and no abuse of discretion exists where the trial court bases its decision on conflicting evidence. *Davis*, 571 S.W.2d at 862. There is no abuse of discretion so long as the record contains some evidence of a substantive and probative character to support the trial court's decision, *Coburn*, 433 S.W.3d at 823; *Valdez v. Valdez*, 930 S.W.2d 725, 731 (Tex. App.—Houston [1st Dist.] 1996, no writ); *Flowers*, 407 S.W.3d at 457, and in that case, we will not substitute our judgment for that of the trial court, *Echols v. Olivarez*, 85 S.W.3d 475, 476 (Tex. App.—Austin 2002, no pet.). An appellate court cannot reverse for abuse of discretion merely because it disagrees with a decision of the trial court. *Coleman*, 109 S.W.3d at 110 (citing *Downer*, 701 S.W.2d at 242). The fact that a trial judge may decide a matter within its discretionary authority differently than an appellate judge in a similar circumstance might have done does not demonstrate an abuse of discretion. *Downer*, 701 S.W.2d at 242.

The parties could not agree on the circumstances in which the children could fly with Mr. Pearson in his airplane. The Decree of Divorce includes the following order, which the court expressly found to be in the children's best interest:

> Until each child is eight (8) years old, BYRON DAVID PEARSON is prohibited from permitting the child to fly in any non-pressurized private or non-commercial airplane, unless another licensed private pilot is flying the plane so that BYRON DAVID PEARSON can tend to the child. After each child reaches eight (8) years of age, BYRON DAVID PEARSON shall be permitted to fly with the child on any non-pressurized private or non-commercial airplane, provided that another licensed private pilot is flying the plane so that BYRON DAVID PEARSON can tend to the child, or provided that BYRON DAVID PEARSON is accompanied by a responsible and familiar caregiver of the children over twenty-one (21) years of age.

22

Under this order, Mr. Pearson's children can always fly with him in his private plane. Until a child is eight years of age, however, a licensed pilot other than Mr. Pearson must fly the plane so that Mr. Pearson can tend to his children during flight. After a child attains eight years of age, Mr. Pearson can pilot the plane so long as he and the child are accompanied by another adult, who is a responsible and familiar caregiver of the children.

The court's condition only applies to flight in an unpressurized airplane. The trial court did not place any restriction on flights in pressurized aircraft, commercial airplanes, or any other mode of transportation. The trial court did not require Mr. Pearson to transport the children by any particular means or mode of travel, nor did it prohibit Mr. Pearson from utilizing any mode of travel. Nevertheless, Mr. Pearson complains that the trial court abused its discretion because the order restricts visitation and significantly infringes upon the family relationship and the children's ability to bond and communicate with him as their non-custodial parent. *See* Tex. Fam. Code § 153.001(a)(1) (public policy is to assure children have frequent and continuing contact with parent). He also argues it unreasonably restricts his recreational activities with his children. Mr. Pearson contends that the evidence is legally and factually insufficient to prove good cause to restrict his legal private air travel and, in the absence of good cause, the trial court's ruling violates the Texas Family Code and constitutes an abuse of discretion.

The Texas Family Code provides that the trial court may restrict the means of travel of a child by a legal mode of transportation only after a showing of good cause contained in the record and a finding by the court that the restriction is in the best interest of the child. *Id*. § 153.257. Mr. Pearson relies upon this statute to argue that the trial court improperly restricted the children's means of flying with him in his airplane, a legal mode of travel, and that no good cause for the

restriction was shown. Assuming that this statutory provision governs the trial court's order, it is implied that the trial court found that the record contained evidence of good cause.

The evidence demonstrates that non-commercial flying is a legal and statistically safe mode of transportation. Mr. Pearson owns a private, non-pressurized, propeller aircraft with a small, compact cabin that seats four people. Mr. Pearson's plane is "technically advanced" with special safety features. In the event of an emergency or if the pilot becomes disabled, an external parachute can allow the plane to settle to the ground. There are several controls and procedural steps that a pilot or passenger must follow in order to deploy the chute and, of course, the plane will land on whatever is below, not at an airport or landing strip.

The evidence shows that Mr. Pearson is a competent, safe, responsible, experienced, and conscientious pilot. Mrs. Pearson confirmed that he is careful and meticulous. However, the issue at trial was not only whether Mr. Pearson was a skilled pilot or whether his plane was safe; those facts were essentially undisputed. The contested issue concerned whether, as the only adult onboard, he could safely pilot his plane while simultaneously caring for the children. Mrs. Pearson testified that she has only flown with Mr. Pearson five to seven times and has only flown in his current plane once or twice. She and Sydney have flown with Mr. Pearson a few times. Sydney flew with Mr. Pearson alone one time on a fifteen- or twenty-minute flight from Austin to Burnet. Mr. Pearson testified that Sydney was two when she first flew in the plane with him; Mrs. Pearson testified that the child was four or five. It does not appear that Peyton has ever flown with him.

Mrs. Pearson testified that Mr. Pearson becomes anxious even before the flight begins. He becomes tense if distracted by conversation or noise in the passenger area which might interfere with his flying or communicating with air traffic controllers. She has experienced his

24

anxiety, and it is stressful for all concerned. Whenever the family flew together, her responsibility was to keep the child as quiet as possible to prevent any distraction or interference with Mr. Pearson's concentration. As she put it, "Don't talk. Don't move. Don't do anything or he just freaks out."

The parties own vacation property in Crested Butte, Colorado. The flight time to Gunnison, Colorado, is about three hours and twenty minutes. Mrs. Pearson testified that ordinarily, she flew to Colorado with the children on commercial aircraft, transporting them and all their items with her, even when Mr. Pearson flew his plane to Colorado. She and the children have never flown with him to Gunnison. They did fly together once in a larger, pressurized plane.

Both children are active, and the younger child especially is a strong-willed two-year-old. Mrs. Pearson did not believe that Mr. Pearson could fly and tend to an eight-year-old, much less a child of two. She expressed concern about the children's abilities to behave as passengers for long distances without proper supervision; about their flying alone in a very small cabin, which can be a high-stress situation; and about the necessity of Mr. Pearson's need for strict concentration when flying long distances, especially in areas such as the Rocky Mountains. She was concerned whether he could supervise and tend children while piloting a plane. One of Mr. Pearson's witnesses made similar observations. There was testimony and discussion about using eight years of age as a cutoff date for supervision, perhaps because the older child was already eight. Mrs. Pearson wanted the age to be older, at least ten or more.

The first time Mr. Pearson took Sydney in the plane, Mrs. Pearson was also in the plane, and he also took along his flight instructor Gary Biba to assist him in case Sydney was unhappy or they had any kind of issue. Mr. Biba testified that Sydney was a happy flier. He also

testified, however, that somebody has to be in charge of the plane and in control of the aircraft. The pilot is responsible, and his attention must be devoted to flying the plane. In the event a child should cause an issue, he testified that hopefully an adult or older child would be on board to help control the situation.

A pilot friend testified that he had flown with both Pearson daughters and they were well-behaved and calm. He stated that as a pilot Mr. Pearson exercised a "very calm, rational approach and decision-making process." Communication with flight controllers usually occurs only at intervals; during the interim, the pilot could attend to passengers' needs. Mr. Pearson's plane allows one-handed flying and has an autopilot system so that Mr. Pearson could pilot and simultaneously attend to other things on the plane, if necessary.

The passenger compartment in Mr. Pearson's unpressurized airplane is loud and the noise can damage hearing. Passengers must wear headsets, or at least ear plugs, in order to protect their hearing and to hear and communicate with one another by intercom. Mr. Pearson must wear headphones to communicate with air traffic controllers. The headsets are large and adult-size. In addition, the pilot and passengers must utilize an oxygen hose with a nose piece that fits into the nostrils when flying above a certain altitude. The inference is that someone must assure that the children wear headsets and the oxygen apparatus and keep them on when the situation requires. Mr. Pearson and Mrs. Pearson had practiced allowing Sydney to wear the headsets at home, but had not considered the oxygen apparatus, which apparently caused the child extreme agitation when she was required to use it. Mr. Pearson testified that he had practiced flying into Gunnison while staying below the altitude ceiling and did not intend to exceed that level with the children.

26

Apparently, Mr. Pearson concedes that some restrictions on flying with the children would be reasonable. On the one hand, he saw no need for any restriction, and he requested to fly Sydney alone and unrestricted. At the same time, he understood the need to have another adult accompany him with Peyton until she was older. While in his view no court restrictions are required, he suggests that the court's initial ruling limiting flight conditions until eight years of age—which in itself was an arbitrary age discussed at trial—clearly and properly weighed all of the evidence in favor of fairly limited restrictions. But Mr. Pearson contends that the court exceeded its discretion because the conditions it finally employed are excessive and lack a basis in reason.

Mr. Pearson argues that the trial court rendered its decision based upon antagonism toward him and personal bias toward private air travel, rather than on the children's best interest. He supports his position by pointing to the court's oral comments from the bench—complaining that the judge changed her ruling several times—and attributing bias and prejudice to her decision-making.

Although the trial court's decree speaks for itself, we will briefly address Mr. Pearson's serious criticisms. At the conclusion of the evidence, the trial court initially ruled that Mr. Pearson could fly the children without restriction, except that in an unpressurized plane he must be accompanied by another licensed pilot or responsible adult caregiver until the child was eight. Even though the trial judge stated, "I don't personally much like private jets," she recognized that this was an activity the parties had engaged in while married and put aside her views. However, the court emphasized that, especially with respect to the younger child, Mr. Pearson must be the parent, not the pilot.

When the parties could not agree on the specific terms of the decree, the court held a hearing on the motion for entry of judgment. At that hearing, there was extensive discussion and argument about the terms on which the children could fly. Each side proposed language for the decree; Mrs. Pearson proposed the language that the court ultimately adopted.

At first the judge maintained her original ruling, even though private airplane travel "wasn't [her] favorite thing to do." The court emphasized that the younger child could not fly without another adult and again directed that Mr. Pearson must be the parent, not pilot. When Mrs. Pearson's counsel requested an additional condition, Mr. Pearson interrupted saying, "I need to speak . . . y'all—everybody's talking about things that, I apologize, you really don't understand." The court stated, "Okay . . . [Counsel], you shouldn't have let your client speak. . . . I'm changing my mind. I'm adopting the language provided to me by [Mrs. Pearson's counsel]." The trial court did not respond to Mr. Pearson or admonish him. Nevertheless, Mr. Pearson characterizes the trial court's comments as angry, hostile, and twice describes them as irrational, asking us to assume the same.

When the hearing resumed after a recess, Mr. Pearson apologized to the court. Without responding, the judge announced her final ruling. She admitted that she had been struggling with what flight conditions were best for the children. After deliberating, the court found that it was in the children's best interest to set conditions and to adopt the language provided by Mrs. Pearson's counsel. Mr. Pearson's counsel complained that the language proposed by Mrs. Pearson went beyond age eight, and the court ruled, "I understand what their language is and we're adopting it here today." Mr. Pearson retorted, "So the children can't fly."

28

Mr. Pearson attributes improper motive to the trial court's statements and contends that these exchanges demonstrate that the court was not concerned with the children's best interest but instead accuses the judge of basing her decision on her personal bias against private aircraft travel and her "pique" against him. Mr. Pearson characterizes the court's ruling as capricious, unduly restrictive, unsupported by any evidence or legal theory, and complains that it violates the constitutional and legal protections against curtailment of travel and visitation rights, lacks a connection to the children's welfare, and is grounded solely in what he characterizes as the court's irrational and hostile response to him. Without good cause for the conditions, Mr. Pearson claims, the court acted arbitrarily and thus abused its discretion.

Although Mr. Pearson does not assert a specific issue on appeal requesting reversal based on the trial court's bias and prejudice, he does so indirectly in his argument. We note that judicial rulings alone almost never constitute a valid basis for showing the trial court's bias or impartiality. Judicial remarks during a trial that are critical, disapproving, or even hostile to a party or counsel do not demonstrate bias, and expressions of impatience, annoyance, or even anger do not establish bias or partiality. *Liteky v. United States*, 510 U.S. 540, 555 (1994); *Dow Chem.*, 46 S.W.3d at 240. We decline to adopt Mr. Pearson's allegations. In any event, our duty is to determine whether the record contains evidence on which the trial court could rule as it did.

With respect to the need for good cause, we find only three reported Texas cases that cite section 153.257 of the Texas Family Code concerning a need for showing good cause; only one of those is somewhat helpful. *In re M.A.S.*, 233 S.W.3d 915, 923 (Tex. App.—Dallas 2007, pet. denied) (requirement for parent to give written notice of intention to take possession of child at airport not a restriction on means of travel; whether to fly was optional, not mandatory, therefore

29

showing of good cause not required). Mr. Pearson also cites to three cases from other states in support of his position. These cases differ from the standard of review Texas appellate courts apply to trial-court rulings on the subject. *See Mord v. Peters*, 571 So. 2d 981, 984 (Miss. 1990) (pilot father could fly child absent showing activity would be detrimental to child's welfare or endanger life, a standard more stringent than best-interest test); *DenHeeten v. DenHeeten*, 413 N.W.2d 739, 741 (Mich. 1987) (trial court prohibited father from flying children privately; appellate court reviewed evidence de novo and reversed because appellate court would have decided case differently, contrary to Texas rule); *cf. Siliquini v. Kegel-Siliquini*, 2001 PA Super 312, 786 A.2d 275, 278 (2001) (reversed trial court's order allowing father to fly child and imposed restrictions because trial court applied inherent-danger standard, not best-interest test, and appellate court had "grave concerns" about child's safety during flights).

We hold that the record contains legally and factually sufficient evidence for the trial court to exercise its discretion and that Mr. Pearson has not shown that the court abused its discretion in doing so. To the extent good cause is required for the court to place conditions on Mr. Pearson flying his children with him in a non-pressurized, private aircraft, the record supports the trial court's finding of good cause.

## CONCLUSION

The record contains fourteen volumes of reporter's record and exhibits. The trial court heard extensive testimony from the parties and related witnesses concerning the issues of characterization of property and terms of the children's air flight. We have reviewed the evidence,

30

applying the correct standards of review.  We overrule Mr. Pearson's complaints on appeal.  We

affirm the trial court's decree.

_____

Marilyn Aboussie, Justice

Before Chief Justice Rose, Justices Bourland and Aboussie*

Affirmed

Filed:   January 15, 2016

* Before Marilyn Aboussie, Chief Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).